UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **ATLANTIC SOUNDING CO.** | **CIVIL ACTION** |
| **VERSUS** | **NO: 15-2663 c/w 15-2887** |
| **JESSICA SMITH** | **SECTION: "H"(1)** <br> **(Applies to all matters)** |

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

At issue in these consolidated matters is whether Jessica Smith, a former employee of Atlantic Sounding Co., Inc., is owed maintenance and cure and damages for a back injury that she allegedly sustained while working aboard the C.R. MCCASKILL, a vessel owned by Weeks Marine, Inc. In the main action, Atlantic Sounding Co., Inc. and its parent company, Weeks Marine, Inc. (collectively, "Atlantic Sounding"), seek a declaratory judgment that they do not owe Smith maintenance and cure benefits. In the consolidated action, Smith seeks maintenance and cure benefits and damages under the Jones Act and general maritime law for her injuries. Smith alleges that she slipped and fell down a small staircase while working on the MCCASKILL and injured her back.

Having considered the evidence admitted at trial and the arguments of counsel, this Court makes the following findings of fact and conclusions of law.

1

To the extent a finding of fact constitutes a conclusion of law, and vice versa, the Court adopts it as such.

## **FINDINGS OF FACT**

1. At all material times, Weeks Marine, Inc. was the owner of the dredge, C.R. MCCASKILL.
2. At all material times, Jessica Smith worked for Atlantic Sounding as a galley hand aboard the C.R. MCCASKILL.
3. At all material times, Smith earned $11.59 per hour on a 28 days on, 14 days off rotation.
4. Smith was a seaman and member of the crew of the C.R. MCCASKILL.
5. On the morning of June 25, 2015, Smith escorted a new employee from the galley to the captain's office, which was upstairs from where Smith was working.
6. On her return from the captain's office, Smith had to walk down a four-step staircase to return to the galley to continue her work, and she slipped and fell on the stairs.
7. Smith's fall was not witnessed by anyone else.
8. The deck above the stairs upon which Smith slipped was coated with a non-skid additive.
9. The steps on which Smith slipped were made of an open bar grading, which is an excellent non-skid material, and the nosing of each step contained a diamond plating. The diamond plating was worn in some areas.
10. The area where Smith fell had recently been pressured washed to remove bugs and was still wet.

11. The non-skid surfaces make it difficult to slip, even if wet.
12. Smith immediately reported the incident to her supervisor Angela Williams. She was directed to the captain's office to complete an accident report.
13. In the accident report, Smith indicated that she slipped on the top step and that the stairway was dry.
14. Park Tritle, the safety officer, transported Smith to Plaquemines Medical Center immediately after she reported her fall for evaluation and treatment due to her reports of pain in her "back and upper butt."
15. At Plaquemines Medical Center, Smith was examined by Dr. Maria Cartagena and x-rays were performed. Plaintiff was thereafter released to return to work without restriction. Dr. Cartagena recommended anti-inflammatories and heat or ice for pain.
16. The following day, June 26, Smith again complained of back pain, and Tritle brought her back to the Plaquemines Medical Center.
17. She was again examined by Dr. Cartagena who subsisted in her opinion that Smith had suffered a strain. She did not prescribe any narcotic medications but sent Smith for an MRI.
18. Tritle then transported Smith to a different facility to undergo an MRI.
19. Smith had a thoracic and lumbar spine MRI, which revealed no disc herniation, neurocompressive midline, lateral recess, or foraminal stenosis. The MRI did not reveal any traumatic pathology.
20. After leaving the facility where the MRI was performed and returning to Plaquemines Medical Center, Smith informed Tritle that her mother and brother had arrived to pick her up.

21. Smith had not previously mentioned to Tritle that she planned to go home despite having been released to return to work by Dr. Cartagena.
22. Smith left with her family and did not return to the MCCASKILL to continue her hitch.
23. On June 29, 2015, Smith visited a new physician and complained of nearly constant pain in her mid-back, left thigh, left foot, head, left ankle, and back of the neck. She rated her pain at a level of 9 or 10 on a scale of 1 to 10. She underwent a cervical spine MRI, which revealed no evidence of a traumatic injury.
24. Thereafter, Smith sought treatment at Southern Brain & Spine and saw neurologist Rand Voorhies on July 21, 2015. She complained to Dr. Voorhies of pain in her neck, mid back, low back, right hip, left leg, and left arm, as well as headaches.
25. Dr. Voorhies's examination on that date was normal, except that he noted a "somewhat restricted" range of motion in the cervical spine due to pain.
26. At Dr. Voorhies recommendation, Smith underwent an EMG nerve conduction velocity study on both legs on October 7, 2015, and the results were normal.
27. Dr. Voorhies recommended physical therapy and a cervical epidural steroid injection, which Smith received on December 18, 2015. The injection relieved Smith's pain for a short time, but it returned.
28. Dr. Voorhies never finalized a specific diagnosis of Smith's pain and never recommended any type of surgical intervention. He did not note any evidence of abnormal neurological findings.

29. Dr. Voorhies indicated that all of Smith's tests were normal, except for a slight bulging in the cervical spine at C5-6 and the lumbar spine at L4-5 of a "subtle nature."
30. Dr. Christopher Cenac Sr. conducted an independent medical examination of Smith on June 14, 2016. Dr. Cenac did not find any objective evidence of orthopedic mechanical dysfunction or neurological deficits.
31. Dr. Cenac indicated that all of Smith's tests were normal except that her MRI revealed some degenerative changes.
32. Smith has continued to complain of pain in her neck, mid back, and lower back of eight to ten on a scale of one to ten.
33. Prior to the fall at issue here, Smith never complained of back or neck pain.
34. After Smith returned home, Atlantic Sounding refused maintenance and cure. Atlantic Sounding has not paid for any of Smith's medical care apart from the initial visits to Plaquemines Medical Center.
35. Smith became pregnant in early 2016 and since that time has been taking only extra strength Tylenol for her pain.
36. This Court finds that Smith reached maximum medical improvement on June 29, 2015 when her second MRI revealed no abnormalities in her spine other than degenerative changes. No abnormalities were ever identified by any physician. All of the care that Smith has received has been palliative.
37. Because Smith's doctors have not been able to identify the cause of her pain, there are no steps to be taken to improve her condition other than palliative care.

## CONCLUSIONS OF LAW

Maintenance and Cure

1. A seaman who becomes sick or injured during his service to the ship is entitled to maintenance and cure. *Cooper v. Diamond M Co.*, 799 F.2d 176, 178–79 (5th Cir.1986) (citations omitted).

2. "'Maintenance' encompasses a seaman's living expenses, while 'cure' covers payment of medical or therapeutic treatment." *Pelotto v. L & N Towing Co.*, 604 F.2d 396, 400 (5th Cir. 1979) (citations omitted).

3. "Maintenance and cure must be paid by the seaman's employer until the point of 'maximum medical recovery' or 'maximum cure.' Maximum cure is achieved when it appears probable that further treatment will result in no betterment of the seaman's condition, a determination that would be appropriate if the seaman's injury is incurable or future treatment would merely relieve pain and suffering but not otherwise improve the seaman's physical condition." *Alario v. Offshore Serv. Vessels, L.L.C.*, 477 F. App'x 186, 188 (5th Cir. 2012) (internal quotations omitted).

4. "Palliative treatment alone is insufficient to demonstrate an entitlement to continued maintenance and cure." *Alario v. Offshore Serv. Vessels, L.L.C.*, 477 F. App'x 186, 188 (5th Cir. 2012)

5. Smith reached maximum medical improvement when her second MRI showed no abnormalities. All recommended care has been palliative. Accordingly, Atlantic Sounding owes maintenance and cure through June 29, 2015. At that point, it became probable that further treatment would not improve her condition.

Jones Act

6. The Jones Act creates a cause of action for negligence when a seaman is injured in the course of his employment. *Atl. Sounding Co. v. Townsend*, 557 U.S. 404, 416 (2009).

7. "An employer is liable under the Jones Act if the negligence of its employees played any part, even the slightest in causing the injury or death for which damages are sought. Even so, the Fifth Circuit clarified that the employer's standard of care is not greater than that of ordinary negligence under the circumstances. A Jones Act employer is not an insurer of a seaman's safety; the mere occurrence of an injury does not establish liability." *Stowe v. Moran Towing Corp.*, 995 F. Supp. 2d 570, 575 (E.D. La. 2014) (internal citation omitted).

8. At all material times, Atlantic Sounding was Smith's employer pursuant to the Jones Act, and Smith held seaman status.

9. The Court finds as a matter of law that Atlantic Sounding exercised ordinary prudence and took reasonable case in providing Smith with a safe place to work. The decking and stairs in the area at which Smith slipped were non-skid and although the non-skid was worn in some areas, Smith failed to establish where she slipped. Smith did not carry her burden of proof establishing that Atlantic Sounding was negligent or that such negligence was the cause of the accident. Atlantic Sounding is therefore not liable to Smith under the Jones Act.

Unseaworthiness

10. "Independent from a claim under the Jones Act, a seaman has a claim for injuries caused by the unseaworthiness of a vessel under general maritime law. The duty of a vessel owner to provide a

seaworthy vessel is an absolute non-delegable duty; the duty imposes liability without fault." *Fluker v. Manson Gulf, LLC*, No. 15-4138, 2016 WL 3346038, at *4 (E.D. La. June 16, 2016)

11. "Unseaworthiness is not a fault-based standard; a plaintiff must show, however, that the unseaworthy condition 'played a substantial part in bringing about or actually causing the injury and that the injury was either a direct result or a reasonably probable consequence of the unseaworthiness.'" *Id.* (quoting *Phillips v. Western Co. of North America*, 953 F.2d 923, 928 (5th Cir. 1992)).

12. "A vessel is unseaworthy only if it presents an unreasonable risk of harm to the seaman. The owner is not obligated to furnish an 'accident-free' ship. Seaworthiness requires only that a vessel and its appurtenances be reasonably suited for its intended purpose or use." *Patterson v. Omega Protein, Inc.*, 26 F. Supp. 3d 544, 547–48 (E.D. La. 2014) (internal quotations and citations omitted).

13. The Court finds as a matter of law that the C.R. MCCASKILL was a seaworthy vessel at the time of Smith's accident and that Smith did not carry her burden to show that a condition of the vessel played a substantial part in her accident. The area at which Smith slipped was non-skid. Even if the area was wet, the non-skid surfaces were designed to prevent Smith from slipping.

## CONCLUSION

For the foregoing reasons, this Court finds for Atlantic Sounding on the Jones Act and unseaworthiness claims. It also holds that Smith is entitled to maintenance and cure up to and including June 29, 2015.

New Orleans, Louisiana this 22nd day of December, 2016.

_____

**JANE TRICHE MILAZZO**
**UNITED STATES DISTRICT JUDGE**